# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| MWENDA MURITHI, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 13 C 00599 |
| MARCUS HARDY and JAMES LOUCH, | ) ) ) ) | Judge John J. Tharp, Jr. |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mwenda Murithi, a prisoner formerly confined at Stateville Correctional Center ("Stateville") brought this action under 42 U.S.C. § 1983 concerning a number of allegedly unconstitutional conditions of confinement. Named as defendants are former Warden Marcus Hardy and former Chief Engineer James Louch. The defendants' motion for summary judgment is currently before the Court. Mot. Summ. J., ECF No. 82. Because the undisputed facts show that the conditions about which Murithi complains do not rise to the level of a constitutional violation, the motion for summary judgment is granted and judgment will be entered for the defendants.

The plaintiff has been ably represented in this case by Michael A. Weinberg and Julie Johnston-Ahlen of Novack and Macey LLP, who were recruited and appointed by the Court. The Court thanks these attorneys for their service, which has helped ensure meaningful access for all to our judicial system and has been in keeping with the highest traditions of the Trial Bar of the Northern District of Illinois.

**BACKGROUND**[1]

Plaintiff Murithi is currently in the custody of the Illinois Department of Corrections ("IDOC") and was incarcerated at Stateville Correctional Center ("Stateville") from April 22, 2009 until February 2013. DSOF ¶¶ 1-2. While at Stateville, Murithi was initially housed in F house from May 2009 until October or November 2009, then moved to B house until December 2012, then returned to F house until February 2013. *Id*. ¶ 2. Murithi was then transferred to a different IDOC facility. *Id*. ¶ 1.

Defendant Hardy has been employed by IDOC for twenty-one years; from October 2009 until December 2009, he was the Assistant Warden of Operations at Stateville, and from December 2009 until December 2012, Hardy served as the Warden of Stateville. *Id*. ¶ 3. As Warden, Hardy was responsible for supervising the safety, security, and sanitation of the Stateville facility. *Id*. ¶ 4. Hardy testified that he made rounds in the cell houses approximately once per week to interact with the staff and offenders and to make sure the institution was

---

[1] The Court takes the following facts from the defendants' Statement of Material Facts (ECF No. 84) ("DSOF"), where undisputed, Murithi's Response to the defendants' Statement of Material Facts and Statement of Additional Material Facts (ECF No. 87) ("MSOF"), and the defendants' Response to Murithi's Statement of Additional Facts (ECF No. 102) (D Resp.).

A number of Murithi's statements of fact cite generally to hundreds of pages of exhibits. *See, e.g.*, MSOF ¶ 88. The defendants object, arguing that such a general citation is inadequate for them to be able to properly respond and dispute the statement. The Court agrees that such citations are insufficient under Local Rule 56.1. As such, the Court will not consider the statements solely supported by these general citations in MSOF ¶¶ 93, 96, 98, 100.

Furthermore, Murithi's statements of fact include three alleged admissions by IDOC, citing various internal documents and emails between IDOC employees. MSOF ¶¶ 97, 101, 104 (allegedly admitting that there was a roach infestation at Stateville, that birds and their droppings cause health issues, and that mice are unsanitary, respectively); *see also* M Ex. Q 2, 32, 47-48, 60, ECF No. 101. The defendants deny that such documentation constitutes a binding admission of the IDOC. *See* D Resp. ¶ 104. While these documents may evidence knowledge of the presence of these pests, and responses to reports of such problems, or other evidentiary significance, they are insufficient evidence to constitute binding *admissions* on the IDOC's behalf in response to Murithi's claims.

operating properly. *Id.* ¶ 4; D Ex. B 75:20–76:20, 84:7-15, ECF No. 84-2. Hardy reviewed monthly reports—the Safety and Sanitation Inspection and the Safety and Sanitation Report—that reported the results of monthly inspections regarding any safety and sanitation issues. MSOF ¶ 87.

Defendant Louch served as the Acting Chief Engineer at Stateville from December 2009 until February 2015 and reported to the Assistant Warden of Operations. DSOF ¶ 5. As chief engineer, Louch was responsible for overseeing maintenance for the Stateville facility. *Id.* Louch testified that if an inmate submitted a grievance regarding a maintenance issue, whoever received that grievance would submit a work order and it would be forwarded to him to address. MSOF ¶ 85; D Ex. C. 174:22–176:11, ECF No. 84-3. Louch was not involved with sanitation at Stateville or overseeing pest control. DSOF ¶¶ 19, 49.

## I. Cleaning Supplies

Murithi alleges that the common areas of both B and F house had dirt, dust, and animal excrement on the floor, stairs, and walkways. MSOF ¶¶ 89-90. Cell house cleaning is handled by a safety and sanitation detail made up of inmate workers who report to security staff. DSOF ¶ 11. These inmate porters were responsible for daily cleaning in the common areas of B and F houses, which included tasks such as picking up garbage, sweeping, mopping, and buffing the floors once or twice each week.[2] *Id.* ¶ 12. Inmates were responsible for cleaning their own cells. *Id.* Murithi cleaned his cell approximately twice per week using towels and shampoo from commissary.[3] *Id.* ¶ 15. Murithi testified that there was no procedure in place for inmates to obtain cleaning supplies (other than those available for purchase at commissary) during the beginning

---

[2] Murithi does not dispute that inmate porters were responsible for and did perform cleaning in the common areas; he disputes the adequacy of their cleaning efforts. MSOF ¶ 12.

[3] Murithi does not dispute that he cleaned his cell twice per week but disputes that he was able to sufficiently clean and sanitize his cell. MSOF ¶ 15.

3

of his incarceration at Stateville, but at some point (the parties disagree when), cleaning supplies began to be passed out to inmates on a regular basis, at least in B house.[4] *Id*. ¶¶ 13-14; MSOF ¶¶ 13-14. Murithi used these cleaning supplies to clean his cell between ten to fifteen times. DSOF ¶ 14.

Murithi testified that he spoke to Hardy a total of three times while incarcerated at Stateville, specifically while Hardy made rounds in B house. *Id*. ¶ 17. Murithi asked Hardy for cleaning supplies on each of these three occasions. *Id*. ¶ 17. Murithi testified that Hardy did not respond to one request for cleaning supplies and that his response to the other two requests was that they would look into it. *Id*. Murithi never met Louch nor did he request cleaning supplies from Louch. *Id*. ¶ 18; MSOF ¶ 18.

## II. Ventilation and Mold

Murithi claims that the cells in which he was housed at Stateville in both F house and B house had inadequate ventilation. F house is a round building, separate from the other cell houses at Stateville, with cells around the outside of the building and a window in each cell. DSOF ¶¶ 10, 26. Murithi had a fan in each of the three cells in which he was housed in F house that he could use to circulate air. DSOF ¶ 26. F house also had exhaust fans and large commercial pedestal fans in the common area of the cell house. *Id*. ¶ 27. An air handler provided ventilation in F house, and its filters were regularly replaced. *Id*.

B house is part of a building divided into four separate cell houses (B, C, D, and E houses). *Id*. ¶ 9. It has five galleries, or floors, with cells along one side of the building and

---

[4] Murithi asserts that cleaning supplies were never available upon request in F house and that they began to be passed out in B house once every two weeks a few months before he left B house. MSOF ¶¶ 13-14. The defendants assert that Hardy established a schedule for cleaning supplies to be distributed in the cell houses and that between 2009 and 2012, cleaning supplies were available to inmates in F house and B house upon request and also made available by security on a weekly basis by security staff. DSOF ¶¶ 13, 16.

4

windows facing the cells running along the opposite wall. *Id*.; D Ex. B 84:16-19. Some of those windows open to allow air to circulate in B house, and those windows are usually open during the summer. DSOF ¶ 28. The front of the cells in B house are bars, with nothing to prevent air from flowing between the cells and the common area. *Id*. Although there were a number of fans in the common area of B house, the fan five feet outside of Murithi's cell did not function. *Id*. Murithi and his cellmate in B house each had a fan in their cell to circulate air. *Id*. The cells in B house have a return air vent; the parties dispute whether these vents are regularly cleaned. DSOF ¶ 29; MSOF ¶¶ 29, 91. Murithi testified that the vent in his cell was covered with a thick layer of dirt and dust and that, although he attempted to clean the vent, he was unable to because of the grate covering the vent. MSOF ¶ 91.

Murithi complained to Hardy about air quality while Hardy was doing his rounds in B house. DSOF ¶ 31. Murithi testified that he wrote approximately ten notes called "kites" to Louch mentioning his concerns with air quality. DSOF ¶ 32. Hardy and Louch testified that they are not aware of any staff or inmate illnesses resulting from the air quality at Stateville. DSOF ¶¶ 31-32.

Murithi testified that he overheard officers complaining about black mold in the Healthcare Unit at Stateville. DSOF ¶ 20. He also testified that he saw a black spongey substance in the back of his cell that he believed was black mold. MSOF ¶ 106. Murithi testified that he wrote three or four kites to Louch about the black substance in his cell and spoke to Hardy once or twice about the substance as Hardy made his rounds in B house. *Id*. Hardy responded that he would look into it. DSOF ¶ 22; D Ex. A 32:16–33:21, ECF No. 84-1. Murithi also mentioned mold in his cell in one of his grievances. *See* M Ex. J IDOC 1323, ECF No. 91. When an offender filed a grievance about potential mold in his cell, the IDOC procedure was as follows:

contact maintenance, have maintenance inspect the area to determine if there is a possibility of mold, and if so, contact Mark Gerdes (IDOC's environmental liaison) to further look into the issue. MSOF ¶ 107. To the best of Murithi's knowledge, the substance in his cell was never tested. MSOF ¶ 106.

Murithi never tried to clean the black substance in case it was black mold because he heard "a rumor that if you mess with it you will get sick." D Ex. A 31:13-18. When asked how he knew mold was dangerous to his health, Murithi stated that he took it seriously because he overheard officers complaining about mold, but he could not identify any symptoms of exposure to black mold. *Id*. 32:1-15. Hardy testified that he did not recall any instances of mold at Stateville between 2009 and 2012. DSOF ¶ 22. Louch also testified that he could not remember any mold issues, but if there were, safety and sanitation personnel, not anyone under his direction, would be responsible for looking into it. D Ex. C 25:18–27:9.

### III. Birds, Mice, and Other Pests

Murithi observed birds, mice, cockroaches, spiders, ants, mosquitos, flies, gnats, and moths in the Stateville facility. DSOF ¶ 37. He testified regarding the frequency with which he observed these pests: he saw approximately ten to fifteen birds and ten to fifteen mice during his incarceration at Stateville; he saw cockroaches every day in both cell houses (although the cockroach situation in F house was worse than B house initially, the situation had improved somewhat by the time Murithi returned to F house, *see* M Ex. J ¶ 15); he saw spiders, ants, gnats, and moths once a month; and he saw flies and mosquitoes regularly in the summer months. D Ex. A 50:23–51:23, 55:14–61:6. Murithi complained to Hardy about the pests at some point during the three conversations he had with Hardy and testified that he wrote between five and ten letters to Louch about the pests. DSOF ¶¶ 46, 48. Staff also complained about the presence of

cockroaches at Stateville. MSOF ¶ 97. Hardy and Louch were aware of the presence of birds, mice, and cockroaches at Stateville. DSOF ¶ 39.

Murithi saw a number of birds in both B and F house; there was a bird's nest in the non-functioning fan outside of his cell in B house. DSOF ¶ 34. Inmate workers cleaned the bird excrement in the common areas, but Murithi alleges that much of the excrement remained after the cleaning and that when the inmate workers buffed the floors, they scattered the excrement around and made it airborne. DSOF ¶ 35; MSOF ¶ 35. If Murithi found any bird excrement in his cell, he cleaned it up himself. DSOF ¶ 35. Hardy testified that he developed a schedule to power wash areas of the cell house where birds congregated in response to complaints about bird excrement. DSOF ¶ 45. Murithi disputes that the power washing reached all of the affected areas and disputes the effectiveness of the power washing at removing bird excrement. MSOF ¶ 35.

The State of Illinois has a contract with an extermination company, Critter Ridder, which includes extermination services at Stateville. DSOF ¶ 40. Critter Ridder sprays the common area of the cell houses at Stateville once per month. *Id*. Hardy testified that he received numerous complaints about Critter Ridder's performance when he first arrived at Stateville, including complaints from staff members that cockroaches persisted after Critter Ridder sprayed the area. DSOF ¶ 41. Hardy learned that there was a problem with the stock chemical Critter Ridder was using (it used expired product for approximately six months because IDOC had not paid Critter Ridder as required under the contract) and worked with the company to change the chemical. *Id*.; MSOF ¶ 99. In response to increased complaints of pests in the individual cells, particularly in F house, Hardy testified that he developed a schedule for Critter Ridder to spray within the cells. DSOF ¶ 41; D Ex. B 57:22–60:13. The parties dispute the frequency with which the individual cell spraying occurred. *See* DSOF ¶¶ 41-42; MSOF ¶¶ 41-42. Hardy testified that the

exterminator sprayed within individual cells in F house approximately once per month (he could not recall whether individual cells in B house were sprayed). DSOF ¶¶ 41-42. Murithi cites to the Critter Ridder sign-in sheets, which indicate that Critter Ridder sprayed the individual cells in F house four times between July 2010 and May 2013 and sprayed the individual cells in B house once.[5] *See* MSOF ¶¶ 41-42, Ex. P IDOC 626, 629, 631, 649, 664, 687, ECF No. 87-12.

To address issues with mice, Hardy asked Critter Ridder for additional glue traps for the common areas of the facility. DSOF ¶ 44. Hardy testified that inmates were not permitted to have glue traps in their cells for security reasons. D Ex. B 56:11-19.

## IV. Murithi's Health Problems

Murithi testified that he experienced health problems while incarcerated at Stateville, including stomach problems, breathing problems, racing heart rate, chest pains, and skin irritation (*i.e.*—bumps on his skin). DSOF ¶ 78. During his almost-four-year stay at Stateville, Murithi sought and saw a doctor for these complaints only twice. *Id.* The doctor conducted tests, which came back normal. *Id.* The doctor did not prescribe any medication for these complaints or diagnose Murithi with any medical conditions.[6] *Id.*

Murithi alleges that that the conditions at Stateville about which he is complaining caused these health problems. M Ex. J ¶ 18. He does not attempt to link any specific condition to a specific health problem but rather generally asserts that the conditions of confinement caused the aforementioned health problems. *See, e.g.*, D Ex. A. 32:9-12. In his deposition, Murithi testified

---

[5] Murithi states that the exterminator never sprayed in the individual cells in B house, citing to the Critter Ridder sign-in sheets. *See* MSOF ¶ 98. From this Court's review of the sign-in sheets, it appears that the exterminator sprayed in the individual cells in B house on December 13, 2012. *See* M Ex. P IDOC 687.

[6] Murithi does not dispute the factual accuracy of these statements but disputes the adequacy of the medical care he received at Stateville. MSOF ¶ 78. This lawsuit, however, does not contain a claim pertaining to the quality of medical care he received.

that no doctor ever told him that any of the conditions at Statesville affected his health in any way. *See* D Ex. A 24:13-16, 32:1-15, 47:22–48:3, 55:2-8, 56:3-8, 57:13-15, 58:3-17, 59:11-13, 60:4-18, 61:11-13. Murithi also testified that he did not believe he "ever got bit by anything" while incarcerated at Stateville. *Id*. 60:21-22, 62:2-5. Murithi testified that his health problems subsided when he was transferred out of Stateville and into Pontiac Correctional Center and that the conditions with respect to vermin were much better at Pontiac as compared to Stateville. MSOF ¶ 112.

Murithi alleges that he experienced "significant anxiety and emotional distress" as a result of the conditions of confinement at Stateville. MSOF ¶ 111. The sole example Murithi offers of this distress is that he had trouble sleeping because he was concerned that roaches would crawl on him and in his mouth and ears while he was sleeping. *Id*. Murithi does not claim, however, that this ever happened. During his deposition, moreover, Murithi testified that he slept approximately six hours per day while in B house and eight to ten hours per day while in F house. D Ex. A 71:20-22, 72:4-5. Murithi never saw a doctor regarding a lack of sleep or for any health concerns related to sleeping. *Id*. 72:20–73:4.

Murithi spoke to Hardy about all of these conditions at some point during the three conversations he had while Hardy made rounds in B House. MSOF ¶ 82. Murithi testified that he sent a number of kites to Louch about these conditions, as well. *Id*. ¶ 83. He also filed grievances about these conditions-of-confinement issues. M Ex. J. The defendants have not asserted that Murithi failed to exhaust his administrative remedies.

Murithi filed this lawsuit in February 2013 alleging unconstitutional conditions of confinement, including unsanitary cell conditions, lack of access to cleaning supplies, the presence of black mold, inadequate ventilation/poor air quality, and various pest infestations.

Compl., ECF No. 1. He also asserts claims based on bright lighting, water quality, lead paint, and overcrowding.[7] Murithi alleges that defendants Hardy and Louch were aware of and deliberately indifferent to these conditions and seeks monetary damages and injunctive relief. Hardy and Louch filed the instant motion for summary judgment.

## DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Jajeh v. County of Cook*, 678 F.3d 560, 566 (7th Cir. 2012). When considering a motion for summary judgment, the Court construes the facts and makes all reasonable inferences in favor of the non-moving party. *Jajeh*, 678 F.3d at 566. "[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting evidence, . . . or make credibility determinations." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (internal quotation marks and citation omitted). Rather, the Court's role is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

Incarcerated persons are entitled to confinement under "humane conditions that satisfy 'basic human needs.'" *Rice ex rel. Rice v. Correctional Medical Services*, 675 F.3d 650, 664 (7th Cir. 2012) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)). The Eighth Amendment imposes a duty on "prison officials [to] ensure that inmates receive adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Prison conditions, however, "may be harsh and uncomfortable without violating the Eighth Amendment's prohibition against cruel and unusual punishment." *Dixon v. Godinez*, 114 F.3d 640, 642 (7th

---

[7] Because Murithi failed to respond to arguments based on these claims and has therefore waived these claims, the Court need not discuss the facts surrounding these particular complaints. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).

Cir. 1997) (citing *Farmer,* 511 U.S. at 833-34); *see also Rhodes v. Chapman*, 452 U.S. 337, 349 (1981) ("the Constitution does not mandate comfortable prisons"). A claim of constitutionally inadequate confinement requires a two-step analysis: (1) "whether the conditions at issue were sufficiently serious so that a prison official's act or omission result[ed] in the denial of the minimal civilized measure of life's necessities"; and (2) "whether prison officials acted with deliberate indifference to the conditions in question." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (internal quotation marks and citation omitted). "Deliberate indifference . . . means that the official knew that the inmate faced a substantial risk of serious harm, and yet disregarded that risk by failing to take reasonable measures to address it." *Id*. Mere negligence is insufficient to constitute deliberate indifference. *Eddmonds v. Walker*, 317 F. App'x 556, 558 (7th Cir. 2009). Moreover, even if a prison official is aware of a substantial risk of serious injury to an inmate, "he is free from liability if he responded to the situation in a reasonable manner." *Id*. (quoting *Fisher v. Lovejoy,* 414 F.3d 659, 664 (7th Cir. 2005)); *see also Farmer,* 511 U.S. at 847.

**I.  Waived Claims**

In his complaint, Murithi asserts claims based on bright lighting, water quality, lead paint, and overcrowding. In his response to the motion for summary judgment, however, Murithi makes no argument on these claims. So, too, with respect to his request for injunctive relief; Murithi failed to respond to the defendants' arguments regarding the availability of injunctive relief. As such, he has waived these claims, *see Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010), and the motion for summary judgment is granted as to these claims.[8]

---

[8] In any event, having been transferred from Stateville, Murithi's claim for injunctive relief applicable to the Stateville facility is moot.

## II. Unhygienic Conditions and Access to Cleaning Supplies

Murithi claims that the conditions at Stateville were "highly unsanitary" and that such conditions, combined with the denials of his requests for cleaning supplies, constituted a sufficiently serious condition in satisfaction of the first prong of the two-step analysis. Resp. 12, ECF No. 86. The defendants argue that cleaning supplies are a luxury, not a necessity of life and, therefore, Murithi does not have a constitutional right to cleaning supplies in his cell. Mem. in Supp. 9, ECF No. 83. They argue that even if he did have such a right, Murithi's admission that he was able to clean his cell twice per week using towels and shampoo from commissary defeats a showing of the objective seriousness of the conditions.

Under certain factual circumstances—*i.e.* confinement, even for a short period of time, in the presence of human waste or blood—unhygienic conditions and lack of access to cleaning supplies has constituted the basis of a conditions-of-confinement claim. *See Vinning–El v. Long,* 482 F.3d 923, 924-25 (7th Cir. 2007) (reversing summary judgment where prisoner was held for six days without sanitation items in cell contaminated with human waste and blood with non-functioning sink and toilet); *Johnson v. Pelker,* 891 F.2d 136, 139-40 (7th Cir. 1989) (reversing summary judgment where prisoner was denied cleaning supplies and confined for three days to cell that was smeared with human waste and lacked running water). Here, Murithi complains of dust, dirt, and bird excrement in the common area of Stateville (he cleaned any excrement that made its way into his cell); this does not compare with the extremely unsanitary conditions in *Vinning-El* and *Johnson*, involving contamination with human waste and blood and non-functioning plumbing. Moreover, Murithi admits that he was able to clean his cell twice per week using towels and shampoo he purchased from commissary, and he admits that cleaning supplies became available towards the end of his stay in B house that he used to clean his cell

between ten to fifteen times. Thus, although it is hard to understand why a prison staff would not readily facilitate the efforts of prisoners who seek to clean their cells (indeed, one might expect regular cleaning to be a requirement), Murithi's claim that the defendants did not supply adequate cleaning supplies does not amount to a constitutional violation. *See Allen v. Hardy,* No 11 C 4147, 2012 WL 5363415, at *5 (N.D. Ill. Oct. 26, 2012) (lack of cleaning supplies did not result in constitutional violation because plaintiff was able to receive cleaning supplies without incident for the last year and was always able to clean cell with soap and personal towel); *Sanchez v. Walker,* No. 09 C 2289, 2010 WL 5313815, at * 9 (N.D. Ill. Dec. 17, 2010) (lack of cleaning supplies did not result in constitutional violation because plaintiff could have used available water and clothing to clean his cell).

The motion for summary judgment is granted as to this claim.[9]

## III. Mold and Ventilation

Murithi believes that the black substance he saw in the back of his cell was black mold, and he voiced concern about the potential mold on a number of occasions. Hardy acknowledged the proper procedure when confronted with potential mold: contact maintenance to assess the situation and then contact the environmental liaison if necessary. According to the evidence in the record, this policy was not followed; there is no evidence of maintenance ever examining or testing the substance in Murithi's cell. Therefore, it is impossible to know whether or not the black spongey substance was actually black mold.

Regardless, Murithi has failed to demonstrate that the alleged mold caused him any harm. His subjective belief that any one, or a combination, of the conditions at Stateville may have

---

[9] Murithi's claim against Louch based on unsanitary conditions and lack of cleaning supplies also fails because it is undisputed that Louch was not involved with cleaning and sanitation at Stateville. *See* DSOF ¶ 19; *see also* DSOF ¶ 18 (Murithi never asked Louch for cleaning supplies).

caused any one of a number of health problems does not create a genuine dispute of fact. Indeed, the medical tests conducted in response to his complaints returned normal results. The rumor Murithi heard, "if you mess with [mold] you will get sick," is insufficient to create a triable issue. D Ex. A 31:13-18. "'[C]onclusory allegations, without backing from medical or scientific sources, that [the plaintiff was exposed] to diseases and . . . problems which he would not otherwise have suffered' are insufficient to survive summary judgment." *Mejia v. McCann*, No. 08 C 4534, 2010 WL 5149273, at *7 (N.D. Ill. Dec. 10, 2010) (quoting *Dixon v. Godinez,* 114 F.3d 640, 645 (7th Cir. 1997)) (brackets in original). Murithi has not claimed that he suffered any psychological distress over the presence of the alleged mold nor is there prospect of future harm as he no longer resides at Stateville. *See Thomas v. Illinois*, 697 F.3d 612, 614 (7th Cir. 2012) (identifying three different types of harm in the context of a pest infestation—physical harm, psychological harm, and probabilistic harm). Murithi has failed to demonstrate that the presence of the suspect mold is an objectively serious condition that violates the Eighth Amendment.

The same is true with respect to Murithi's claims of inadequate ventilation. The dusty vent in his cell, when considered in conjunction with his access to windows for fresh air and personal fans for air circulation, is not an objectively serious condition that falls below "the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 833-34.

The defendants' motion for summary judgment is granted as to these claims.

IV.     **Birds, Mice, and Other Pests**

Murithi asserts that the constant presence of cockroaches and the regular incidence of birds, mice, and assorted insects constitute cruel and unusual punishment. The Seventh Circuit has held that "a prolonged pest infestation, specifically a significant infestation of cockroaches and mice, may be considered a deprivation sufficient to constitute a [constitutional] violation."

*Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008) (citing *Antonelli v. Sheahan,* 81 F.3d 1422, 1431 (7th Cir. 1996)). As an initial matter, Murithi's allegations about the incidence of pests other than cockroaches do not rise to the level of significant infestation. Over the course of nearly four years, Murithi saw approximately ten to fifteen birds and mice and only saw the occasional spider, ant, gnat, moth, fly, and mosquito. *See* D Ex. A 50:23–51:23, 55:14–61:6. An occasional insect and a dozen or so mice and birds over a four-year period do not a significant infestation make. *Compare Antonelli*, 81 F.3d at 1431 (serious infestation where cockroaches and mice were "everywhere," "crawling on [plaintiff's] body" and "'constantly awaken[ing]' him"); *White v. Monahan*, No. 07 C 437, 2013 WL 587511, at *2 (N.D. Ill. Feb. 14, 2013) (such pervasive insect presence that plaintiff was bitten all but nine weeks out of six-year incarceration and sought medical attention for insect bites on ten occasions).

For a successful Eighth Amendment claim based on pest infestation, moreover, the plaintiff must prove some type of harm: "physical injury is not the only type of injury actionable in a prisoner's civil rights suit . . . A second is psychological harm. And a third, . . . is hazard, or probabilistic harm—'loss of a chance,' as it is called." *Thomas*, 697 F.3d at 614-15. Murithi has claimed psychological and physical harm: he stated that he "experienced significant anxiety and emotional distress," which manifested as trouble sleeping, M Ex. J ¶ 20, and that he suffered from stomach problems, breathing problems, racing heart rate, chest pains, and skin irritation. The only evidence in the record of Murithi's emotional distress, however, is the statement in his affidavit that he had trouble sleeping "because he was very concerned that roaches would be crawling on him . . . ." M Ex. J ¶ 20. He testified, however, that he slept approximately six hours per day while in B house and eight to ten hours per day while in F house. D Ex. A at 71:20-22, 72:4-5. Notably, and inconsistently, Murithi claims to have slept more in F house, where he

claims that the cockroach infestation was more severe. There is no evidence of record, moreover, that Murithi ever reported to medical staff any emotional or anxiety problems. No trier of fact could "reasonably conclude that [Murithi] had been subjected to harm"—*i.e.* an insufficient amount of sleep—"sufficient to support a claim of cruel and unusual punishment." *Thomas*, 697 F.3d at 614.

As to his claim of physical harm, Murithi is unable to specifically link any health problems to the pests and affirmatively testified that he was never bitten by anything while at Stateville. *See* D Ex. A 60:21-22, 62:2-5. When Murithi saw a doctor for these complaints, the test results came back normal; there is, therefore, no medical evidence linking his physical complaints to pest infestation (or any of the other problems about which Murithi complains). His argument that the conditions at Stateville caused his health problems is solely based on timing; Murithi states that these problems subsided when he transferred out of Stateville and into Pontiac Correctional Center. MSOF ¶ 112. Although Murithi, as the non-movant, is entitled to all reasonable inferences in his favor, timing alone is an insufficient basis from which to infer causation at the summary judgment stage. *Cf. Nehan v. Tootsie Roll Indus., Inc.*, 621 F. App'x 847, 852 (7th Cir. 2015) ("timing alone rarely creates a fact issue [at the summary judgment stage]" in a retaliation context); *Holyfield-Cooper v. Bd. of Educ. of the City of Chicago*, 604 F. App'x 504, 508 (7th Cir. 2015) ("suspicious timing alone is not enough to support a finding of causation" in a retaliation context). Simply put, Murithi offers no evidence indicating that the pests, as opposed to some other unidentified problem or condition, caused his stomach problems, breathing problems, racing heart rate, chest pains, and skin irritation. "Any inferences [Murithi] asks us to draw ... are based on speculation and thus insufficient to withstand summary judgment." *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 855 (7th Cir. 2015). "Speculation

does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995) (emphasis in original).

Even if the evidence were sufficient to infer that the pests caused Murithi's health problems, the evidence does not establish that the defendants were deliberately indifferent to the pest situation. An extermination company sprayed the prison monthly, and in response to additional complaints, Hardy investigated the cause of the exterminator's ineffectiveness, remedied it, and initiated spraying within individual cells. Murithi concedes, moreover, that the situation improved over time, at least in F house. Although the parties disagree as to the frequency of the additional spraying, that Hardy attended to the increased complaints by implementing individual cell extermination services with any regularity evidences a reasonable response. "Although an only-occasional extermination does not, by itself, necessarily negate a showing of deliberate indifference, the policy of 'frequent' exterminations 'certainly cannot support a claim of deliberate indifference.'" *Mejia*, 2010 WL 5149273, at *11 (quoting *Sain,* 512 F.3d at 895) (internal citation omitted); *see also Chavis v. Fairman*, 51 F.3d 275 (7th Cir. 1995) (unpublished opinion) ("Courts have routinely recognized that [k]eeping vermin under control in jails, prisons and other large institutions is a monumental task, and that failure to do so, without any suggestion that it reflects deliberate and reckless conduct in the criminal law sense, is not a constitutional violation." (internal quotation marks omitted)). Hardy also actively responded to complaints of bird excrement by developing a schedule to power wash areas where birds congregated. That Hardy could have "done more," Resp. 13, to control pests at the facility, as


Murithi argues, does not establish that he was deliberately indifferent to the problem. Plainly he was not.[10]

In short, while pest infestations can rise to the level of a constitutional violation, Murithi has failed to establish a triable issue of fact as to whether the defendants violated his right to be free from cruel and unusual punishment by deliberately failing to address the pest infestation problems at Stateville. *See, e.g., Smith v. Dart,* 803 F.3d 304, 312 (7th Cir. 2015) (affirming dismissal of pest-infestation claim that alleged "[s]piders, rats, roaches, centerpides [sic], flys, gnats and beetles are on the tier[,] also there are nests of spiders under the radiators[,] roaches and gnats make their home in the showers and toilet area."); *Gray v. Hardy*, No. 11 C 7097, 2013 WL 5433280, at *5 (N.D. Ill. Sept. 30, 2013) ("The existence of pests and birds does not establish an objectively serious condition, particularly where, as here, the prison actively seeks to prevent their presence); *Moore v. Monahan,* No. 06 C 6088, 2009 WL 310963, at *7 (N.D. Ill. Feb. 9, 2009) (over five months of exposure to insects, during which inmate was never bitten, did not amount to a constitutional violation). Though undoubtedly unpleasant, his experience in this regard does not rise to the level of infestation claims that have supported findings of constitutional violation. *Compare, e.g., White v. Monohan*, 326 F. App'x 385, 388 (7th Cir. 2009) (describing as a "close call" whether plaintiff's five-year exposure to roaches, mice, bees, and wasps that stung and bit detainee leaving scars on his legs, arms, and back, stated a claim of unconstitutional condition of confinement); *Antonelli,* 81 F.3d at 1431 (allegation that roaches and mice were rampant and crawling on inmate's body, and that inmate had suffered significant

---

[10] Nor was Louch: the undisputed evidence shows that Louch was not responsible for pest control at Stateville. DSOF ¶ 49. Murithi's claim against Louch with respect to the pest situation, therefore, must be dismissed.

physical injury, stated a claim for unconstitutional conditions of confinement, particularly where the jail had sprayed only twice during a 16–month period).

V.     **Combination of Conditions**

Murithi last claims that, even if none of these conditions, individually, is sufficient to violate the Eighth Amendment, the combination of conditions are objectively serious. *See Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006) ("Some conditions of confinement may establish an Eighth Amendment violation in combination when each alone would not do so."). A combined-conditions violation is possible "when the deprivations have a mutually enforcing effect which produces the deprivation of a single, identifiable human need, such as food or warmth . . . ." *Id*. Murithi's claims, viewed in isolation or combination, fall short of this mark. To be sure, his claims describe unpleasant conditions, but those conditions did not deprive him of basic human necessities, and he has adduced no evidence that that the defendants were deliberately indifferent to them or that he was harmed by those conditions.[11] The combination of conditions, therefore, is no more violative of the Eighth Amendment than any of the conditions individually.

---

[11] It bears noting that the absence of physical harm, and the mooting of Murithi's claim for injunctive relief, would limit Murithi's potential recovery to nominal damages and punitive damages, even if Murithi had established actionable deliberate indifference to one or more of the conditions about which he complains. *See* 42 U.S.C. § 1997e(e); *Thomas v. Illinois*, 697 F.3d 612, 614 (7th Cir. 2012).

\*   \*   \*

Murithi has failed to demonstrate that the conditions of his confinement at Stateville were objectively substandard, as required to make out a conditions-of-confinement claim. Because there is no disputed issue for trial as to the constitutionality of the conditions of confinement about which Murithi complains, the defendants' motion for summary judgment is granted.

Dated: March 9, 2016

John J. Tharp, Jr.
United States District Judge